**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 07-cv-00324-CMA-MJW

PAULA D. BRAGG, an Individual,

     Plaintiff,

v.

OFFICE OF THE DISTRICT ATTORNEY, THIRTEENTH JUDICIAL DISTRICT,

     Defendant.

---

## ORDER ON MOTION FOR SUMMARY JUDGMENT

---

This matter is before the Court on Defendant's Motion for Summary Judgment. (Doc. # 55.)  For the following reasons, the Motion is GRANTED IN PART AND DENIED IN PART.

### INTRODUCTION

This is an employment discrimination and retaliation lawsuit.  Plaintiff worked for Defendant from January 1, 1987, through April 7, 2006.  When she resigned in 2006, she worked as Defendant's Director of Victim Services.  Plaintiff alleges that Defendant, and more specifically, certain of Defendant's employees, including Stephen Jones, Robert Watson, and Linda Holloway, retaliated against her for protected activities, made her working conditions so hostile that she felt compelled to resign, discriminated against her on the basis of her gender, and breached an employment contract created by Defendant's policy manual.  Defendant moves for summary judgment on each of

Plaintiff's claims on various grounds including:  Eleventh Amendment immunity, failure

to exhaust administrative remedies, untimeliness, failure to allege a sufficiently hostile

work environment, and failure to allege an adverse employment action.

## FACTUAL BACKGROUND

The Court derives the following facts from the record, including allegations

admitted in the pleadings, the parties' summary judgment briefing, and the summary

judgment exhibits.[1]  The facts are undisputed unless otherwise noted.

## I.    THE PARTIES

Defendant is the District Attorney's Office for the 13th Judicial District, which

comprises seven Colorado counties.[2]  Plaintiff began working for Defendant on January

1, 1987.  She started as administrator for the victim compensation and Victim's

Assistance and Law Enforcement Programs.  Sometime between 1993 and 1995 she

became the Director of Victim Services.  As Director she again administered the victim

compensation and Victim's Assistance and Law Enforcement Programs, and also

ensured compliance with victims' rights legislation, wrote grant proposals, counseled

victims of criminal acts, advocated for crime victims in court, and supervised victim

rights staff.  During her tenure with Defendant, Plaintiff worked at two separate office

locations in Ft. Morgan, Colorado – prior to 2005, she worked at an office on Railroad

---

[1]   Plaintiff relies heavily on her own thirty-three-page affidavit to support her factual assertions.  Although the Court might question the veracity and reliability of such an affidavit under most circumstances, Defendant does not deny or dispute many of Plaintiff's assertions.

[2]   Those seven counties are:  Kit Carson, Logan, Morgan, Phillips, Sedgwick, Washington, and Yuma.

Avenue, after 2005 she worked at 220 Prospect in a building that Defendant leased

from SHARE, a non-profit group.  By the time she left Defendant in 2006, Plaintiff

was the highest-ranking, non-attorney, female employee in Defendant's organization.

## II.   PLAINTIFF'S RELATIONSHIP WITH STEVE JONES

Much of Plaintiff's allegations concern Mr. Jones, an attorney employed by

Defendant.  Mr. Jones began working for Defendant as a deputy district attorney in June

2002.  When Mr. Watson was elected District Attorney in January 2005, he promoted

Mr. Jones to Assistant District Attorney, the second-highest ranking attorney in

Defendant's organization.[3]  Although Mr. Watson directly supervised Plaintiff, Mr. Jones

also had some degree of supervisory authority over Plaintiff, but the parties dispute the

exact amount of authority.  Neither Mr. Jones nor Mr. Watson worked in the same

physical location as Plaintiff; Mr. Watson worked in Sterling, Colorado, and Mr. Jones

worked in a different office in Ft. Morgan.  However, Plaintiff often met with attorneys,

including Mr. Jones, and other employees of Defendant at their offices or at her own

office.

### A.   December 2003 and January 2004 Events

Mr. Jones' relationship with Plaintiff proved interesting (and controversial) from

the start.  Sometime after Mr. Jones began working for Defendant in 2002, he and

Plaintiff began to discuss Mr. Jones' personal life, especially the details of his wife's

---

[3]  Prior to 2005, Mr. Watson's predecessor, Mark Adams, had named Mr. Jones as
the Chief Deputy District Attorney; there was no Assistant District Attorney under Mr. Adams.

illness and his family life.  The two had at least one lengthy meeting of around an hour, but also talked on other occasions in his or another office by the Ft. Morgan courtrooms, and in phone conversations that lasted between thirty and sixty minutes. Plaintiff alleges that the conversations made her uncomfortable, but that she did not initially mention her discomfort to Mr. Jones.  She did, however, attempt to terminate the discussions by telling Mr. Jones that she had "a meeting," or "work to do."  In December 2003, the tenor of the conversations changed and Mr. Jones began to express a personal or sexual interest in Plaintiff.  Plaintiff contends that did she not return Mr. Jones' amorous interest, but Mr. Jones contends that it was actually Plaintiff who pursued an intimate relationship.

Regardless of who was pursuing whom, Plaintiff and Mr. Jones continued to engage in conversations (face-to-face and telephone) after business hours in December 2003 and January 2004.  Mr. Jones mostly discussed himself and his personal life, including his wife's death, and his kids.  Plaintiff did not talk much during the conversations, but she tried to help Mr. Jones through his family issues with advice based on her own experience with a sick husband.  At some point, she mentioned to him that the conversations made her uncomfortable, although when she first mentioned this fact to Mr. Jones, Mr. Adams, or other co-workers is unclear.[4]

---

[4]  Plaintiff informed her husband of Mr. Jones' behavior and Plaintiff's husband contacted Mr. Adams at some point in January 2004.

4

Plaintiff contends that she "would ask him to stop" and "was feeling uncomfortable with the discussion," but Mr. Jones would not "take no for an answer."  A pivotal event in relationship came after the office Christmas party in December 2003.  Plaintiff and Mr. Jones went to a bar because Plaintiff wanted to discuss Mr. Jones' interactions with her.  She also wanted to discuss rumors she had heard floating around the office to the effect that Mr. Jones had been talking about a romantic relationship between Plaintiff and himself.  According to Plaintiff, she and Mr. Jones did nothing but discuss the propriety of their relationship at the bar, and she continued to reject his romantic advances.  Conversely, Mr. Jones later told employees of a more physical encounter that evening.

In any event, Mr. Jones' romantic pursuit continued, despite Plaintiff's January 2004 request that he stop flirting with her and making sexual comments about her. For example, in January 2004, Mr. Jones called Plaintiff and then mysteriously appeared at the shopping center where Plaintiff was grocery shopping.  When Plaintiff asked Mr. Jones how he knew what she was doing and where she was, Mr. Jones responded, "I know a lot of things."  Also in January 2004, Mr. Jones asked Plaintiff to accompany him on a personal trip to visit Mr. Jones' relatives.  Plaintiff demurred and Mr. Jones stated that he would pay Plaintiff to accompany him.

B.     Mid-2004 and 2005 Events

Although the parties dispute the reasons,[5] both sides agree that after January

2004, conversation between Mr. Jones and Plaintiff decreased.  Matters between them

seemed to improve; however, any improvement was short-lived.  At some point in late

2004 or early 2005, Mr. Jones bragged to another lawyer, Patrick Costigan, that he had

sex with Plaintiff sometime in 2003, and that the pair had gotten physically intimate after

the 2003 Christmas party in a vehicle provided to Plaintiff by Defendant.  Mr. Jones then

retracted his statements regarding a sexual relationship with Plaintiff, but the details of

that evening remain unsettled.[6]

The problems with their personal relationship strained working relations between

Mr. Jones and Plaintiff, as well.  Plaintiff alleges that subsequent to January 2004,

Mr. Jones quit working with Plaintiff and her department in the same positive manner

that he had previously employed.  Beginning in 2005, Plaintiff contends that Mr. Jones

stopped communicating with her department.  She states that "He mainly just didn't

want to work with advocates.  He thought they were a nuisance in his way."  In contrast,

Mr. Jones had been "fairly cooperative" with victim advocates prior to the spoiled

relationship between Mr. Jones and Plaintiff.  Mr. Jones' uncooperative attitude towards

the victim advocates spread to other employees in the office.  For example, at an early

---

[5]   Plaintiff alleges that she cut off communications, but Defendant alleges that Mr. Jones ceased his romantic pursuit on his own.

[6]   Casting further doubt on the nature of the relationship between Mr. Jones and Plaintiff, Mr. Adams, the former District Attorney testified that Mr. Jones told him in 2007 that Mr. Jones had sexual relations with Plaintiff, an admission that Defendant does not dispute.

2005 training seminar Plaintiff put on for Defendant's staff, Plaintiff noticed an "obvious" difference in treatment by the attorneys which she attributed to Mr. Jones' influence because he was sitting in the front row of the seminar.

A dispute over one case in April 2005, exemplified the problems between Plaintiff and Mr. Jones, and led to a particularly heated conversation between them. The pair had a disagreement about how to handle a situation involving a domestic violence victim who was threatening to file a complaint against Defendant. Plaintiff contends that Mr. Jones, the supervising attorney on the case, was not returning the victim's phone calls, so Plaintiff stepped in to answer some of the victim's questions. After discussing the case with the victim,[7] Plaintiff told the victim to call Mr. Jones. Shortly thereafter, Mr. Jones received a voicemail message from the victim that raised his ire. He angrily called Plaintiff and told her that she was wrong in talking with the victim and she had been "disloyal" and "devious" in speaking to the victim about case strategy. Mr. Jones then said that he did not want Plaintiff working on any of his cases. Plaintiff attributed Mr. Jones' response to the situation to her purported rejection of his physical advances in the previous year.

She complained to Mr. Watson about the situation and the three attempted to work through the issue. Plaintiff told Mr. Jones that she could work with him if he

---

[7]   Plaintiff and Mr. Jones dispute the exact nature of what Plaintiff said to the victim. Plaintiff contends that the victim asked her about details in her case, to which Plaintiff responded that one possibility was dismissal. Mr. Jones contends that Plaintiff told the victim that Defendant was going to dismiss her case, and this was incorrect. According to Mr. Jones, he had discussed dismissal with the junior attorney on the case, but had decided to do more work on the matter before deciding whether to dismiss the case.

treated her professionally.  Plaintiff and Mr. Jones worked together on a additional few cases, but relations remained strained.  Plaintiff contends that the atmosphere around the office (in Ft. Morgan, where Mr. Jones worked) became "very, very tense," and that certain employees became unfriendly to Plaintiff, whereas they had previously been cordial.  Again, she attributed the mistreatment to Mr. Jones, whom she believed felt scorned by her rejection.

At around the same time, Mr. Watson discussed moving the victim services offices out of the SHARE building and into Defendant's office in Ft. Morgan.  Plaintiff told Mr. Watson that she could not move to Defendant's office because she could not work in the same location as Mr. Jones.  Mr. Watson recalled Plaintiff used the term "stalking" to describe Mr. Jones' behavior, but Plaintiff denies that she used that terminology.  Regardless, she does not deny that she told Mr. Watson about her problems with Mr. Jones, and that they formed the primary reason for her opposition to a change in office location.

Plaintiff also describes how Messrs. Jones and Watson constantly forced to her explain her job duties to them.  She also contends that they required Plaintiff to complete unnecessary, make-work type projects just to harass Plaintiff.  Plaintiff also heard from co-workers about conversations between Messrs. Jones and Watson at staff meetings questioning Plaintiff's whereabouts and wondering what Plaintiff was "trying to pull."  As a result of the treatment by Messrs. Jones and Watson, Plaintiff found herself

withdrawing from her job and keeping things to herself that she would have shared prior to alleged harassment.

Another incident between Mr. Jones and Plaintiff came in February 2006. Typically, Mr. Watson handled the finances, including disbursement of moneys relating to Plaintiff's job. However, at some point, Mr. Watson authorized Mr. Jones as a signatory on Defendant's checking account. Thus, Mr. Jones would occasionally approve check disbursement requests, including Plaintiff's check disbursement requests. Plaintiff alleges that Mr. Jones delayed in approving a check request in February 2006 solely because of their history and that the delay affected her job performance.

### III.   OTHER DISCRIMINATORY OR HARASSING BEHAVIOR

Plaintiff was not the only one to complain about Mr. Jones' demeanor. Mr. Watson admitted that numerous people, including female employees, had complained about Mr. Jones' "brusque, harsh, [and] abrasive" personality. Plaintiff has presented testimony from employees like Sandi Farris, who stated that Mr. Jones used vulgar language in the office, and made derogatory and profane comments about men and women. Mark Miner, a deputy district attorney who observed Mr. Jones, echoed Ms. Farris' comments regarding Mr. Jones' use of foul language to describe women. Defendant does not dispute that Mr. Jones regularly described women with language drawn from a George Carlin skit, but contends that he described both men and women

with a vulgar tongue, as if the equal treatment makes the sexually vulgar language less hostile.

Another incident occurred at the office Christmas party in December 2005, when Mr. Watson showed a video depicting a husband catching his wife in the middle of an extramarital affair.  Apparently, the video clip had no relation to the slide show that Mr. Watson was presenting, but was merely intended to be funny.  Plaintiff alleges that the video appeared to be directed at her because of her history with Mr. Jones, although she admits that it was discriminatory towards women and men.

## IV.   DEFENDANT'S INTERNAL INVESTIGATION

On March 15, 2006, Plaintiff met with Mr. Watson and handed him a formal complaint letter regarding alleged harassment by Mr. Jones.  In her complaint, she listed several events, including the April 2005 disagreement, Mr. Jones' delay in processing the check, and a conversation in front of other employees in which Mr. Jones insinuated that Plaintiff was misappropriating Defendant's funding during a February 2006 trip to Las Vegas.  Plaintiff contends that upon learning of the complaint and Plaintiff's request to keep it confidential, Mr. Watson immediately became angry, "He turned red-faced and just got tight."  Mr. Watson told Plaintiff that he had to investigate the matter and, thus, he could not keep Plaintiff's complaint strictly confidential.  Upon hearing that the complaint would not be kept confidential, Plaintiff took the formal complaint letter back from Mr. Watson and the meeting ended without any formal resolution.

Mr. Watson responded to Plaintiff's complaint by notifying at least two other people, Mr. Jones and Ms. Holloway.  He also requested that Ms. Holloway begin investigating Plaintiff's allegations.  Shortly thereafter, Plaintiff requested another meeting with Mr. Watson, but the second meeting never took place because Mr. Watson did not have time.

On March 21, 2006, Mr. Jones sent Mr. Watson a memorandum responding to Plaintiff's allegations titled, "Hostile work environment claim."  Mr. Jones recapped his version of the events that had occurred between himself and Plaintiff.  Not surprisingly, Mr. Jones' version of the story conflicts substantially with Plaintiff's version.  For example, Mr. Jones stated that in December 2003, Plaintiff had "expressed an interest in beginning a dating relationship with [him]," but "nothing sexual ever took place between" Plaintiff and Mr. Jones.  Mr. Jones stated that it was he who counseled Plaintiff, and he who broke off personal communications in January 2004, not the other way around.  Mr. Jones claimed to have heard of Plaintiff's complaints only through Mr. Watson and he requested that Mr. Watson formally investigate Plaintiff's allegations.

Mr. Jones also explained what he considered to be systemic problems with the victim advocates department.  Mr. Jones contended that his relationship with Plaintiff was not to blame for the disconnect between the victim advocates and the attorneys. In Mr. Jones' opinion, the problems stemmed from an improper relationship that Plaintiff

and other "victim people" had with SHARE, the non-profit that shared office space with Plaintiff's department.

On Mr. Watson's request, Ms. Holloway, an investigator for Defendant, began looking into the relationship between Mr. Jones and Plaintiff, and any issues related to a potential hostile work environment.  Interestingly, Mr. Watson stated that, "No one is complaining that any type of sexual harassment is occurring," although that appears to be exactly what Plaintiff complained of.  Mr. Watson directed Ms. Holloway to interview Mr. Jones and Plaintiff about their relationship and any events tending to create a hostile work environment.  She was also to interview staff and attorneys in the Ft. Morgan office to obtain a sense of whether a hostile environment existed there.

Plaintiff contends that Mr. Watson and Ms. Holloway's investigation was flawed and one-sided from its genesis.  For example, Mr. Watson did not tell Plaintiff about Mr. Jones' March 21, 2006 memorandum, and she did not respond to the allegations therein.  Ms. Holloway also admits that she felt Plaintiff's claims lacked merit and hoped Plaintiff's complaint would go away on its own.  She stated, "And [Plaintiff] was still kind of pointing the finger at [Mr. Jones].  It's his predatory nature.  And I thought whatever. How can you make lengthy phone calls, multiple phone calls, talk to each other for hours in different cities and feel like, you know, you can't hang up?"  Moreover, Ms. Holloway admitted that she was concerned her investigation would impact her future working relationship with Plaintiff.  Ms. Holloway even told Plaintiff that Plaintiff had "a nice family and [she] just need[ed] to let go of all of this and move on."

Plaintiff also contends that Ms. Holloway mistreated her during the investigation. In early April 2006, Ms. Holloway interviewed Mr. Jones, Plaintiff, and Sally Torres, and obtained Mr. Jones' phone records to investigate Mr. Jones and Plaintiff's relationship.[8] The interviews produced "conflicting stories" about Plaintiff and Mr. Jones, which led Ms. Holloway to interview Plaintiff a second time.  Plaintiff contends that Ms. Holloway's investigation was flawed because Ms. Holloway ignored many of the issues raised by Plaintiff in the first interview and treated her with a threatening and confrontational demeanor during the second interview.  For example, Plaintiff claims that Ms. Holloway asked Plaintiff if she knew what the word "slander" meant, implying that Plaintiff was making her case up and slandering Mr. Jones.

Ms. Holloway admits that she was mildly confrontational in her second interview and that she did ask Plaintiff if Plaintiff knew the meaning of the word slander. Ms. Holloway contends that she had reason to suspect that Plaintiff had discussed the investigation with other people outside of Defendant's organization, including the press, the chief of the Ft. Morgan Police Department, and the Ft. Morgan County Sheriff.[9]  Ms. Holloway claims her confrontational behavior resulted from her concern about the veracity of Plaintiff's allegations and the reputations of the people involved,

---

[8]  Plaintiff contends that Ms. Holloway spoke with approximately twenty people, but this allegation is not supported by Ms. Holloway's testimony.

[9]  Ms. Holloway did not actually speak with the Ft. Morgan police, sheriff or press, but rather had heard through Mr. Watson that Plaintiff had disclosed supposedly confidential information regarding the investigation.

13

including Plaintiff and her family, in the relatively close knit law enforcement community of the 13th Judicial District.

Ms. Holloway's skepticism of Plaintiff's allegations carried through to her recommendations to Mr. Watson.  She told him that Plaintiff's allegations were "unfounded," especially her account of the 2003 office Christmas party.  Conversely, Ms. Holloway found Mr. Jones' version of the story credible and supported by his phone records.  Her interview reports and recommendations later formed the backbone of the official "Agency Findings" issued by Defendant, and signed by Mr. Watson, on May 5, 2006.

## V.      PLAINTIFF'S RESIGNATION

On March 30, 2006, Plaintiff sent a resignation letter to Mr. Watson indicating that she would resign in two weeks.  In the letter, she referenced her earlier formal complaint and indicated that she was resigning because of "intolerable" working conditions.  Mr. Watson accepted Plaintiff's resignation on March 30, 2006, but he stated that he disagreed with her on the issue of whether her complaints were going unaddressed.  He pointed out that Plaintiff had retracted her formal complaint letter, other employees had told different versions of the key events in her complaint, and he had already asked Ms. Holloway to investigate the matter.  He concluded his e-mail to Plaintiff by asking that she cooperate with Ms. Holloway's investigation.

Notwithstanding the fact that Plaintiff had given April 14, 2006, as her last day, she notified Mr. Watson in a one-line e-mail that her last day would, in fact, be April 7,

14

2006.  She did not mention her motivations in the e-mail,[10] but she later stated that she moved up her departure date because she disliked the tone of the internal investigation and also because Mr. Watson had accused her of disclosing the investigation to the press without checking to see whether she had, in fact, disclosed anything.

## VI.   POST-RESIGNATION EVENTS

Plaintiff's resignation did not stop the investigation or end the allegedly unlawful employment practices.

### A.   The Agency Findings

Based on Ms. Holloway's recommendations, which essentially adopted Mr. Jones' version of the events, Mr. Watson issued Agency Findings on May 5, 2006. He found Plaintiff allegations of retaliation to lack substance, and labeled Mr. Jones' conduct as "nothing more than ribbing," which he himself had received from Mr. Jones. Notably, Mr. Watson found that Plaintiff had "intentionally and falsely portrayed the relationship between her and Mr. Jones and that she lied to Investigator Wheeler-Holloway . . . about the relevant events."  He found that Plaintiff had made up allegations about Mr. Jones to avoid being moved into the same office location as Mr. Jones.  Not surprisingly, Plaintiff disputes virtually every aspect of the Agency Findings and contends that Mr. Watson issued them in retaliation against Plaintiff for filing her complaint.

---

[10]   Prior to her resignation, the High Plains Sexual Assault Center ("Assault Center") had offered Plaintiff a job as executive director.  Plaintiff and Defendant dispute whether the Assault Center had asked Plaintiff for an answer on the job offer by March 29, 2006.  Regardless, Plaintiff had accepted the job with the Assault Center on April 4, 2006.

The findings indicate that, had she still been employed by Defendant, Mr. Watson would have terminated Plaintiff immediately for dishonesty.  However, Mr. Watson concluded that, since Plaintiff had resigned, Defendant could not take corrective action against her for the false claims.  Instead, he stated that, "Her status with this office will be reported to any prospective employers as 'ineligible for rehire.'"  Mr. Watson did not directly contact any of Plaintiff's prospective employers, but he provided a copy of the Agency Findings to Mr. Jones, Plaintiff, the county commissioners for each of the counties that comprise the 13th Judicial District, and a reporter from the Sterling *Journal-Advocate*.

     B.    <u>The June 7, 2006 Letter</u>

The dispute between the parties did not end with the issuance of the Agency Findings.  On June 7, 2006, acting on the belief that Plaintiff had contacted law enforcement authorities requesting the names and addresses of sexual assault victims in the 13th Judicial District to contact them for group therapy at the Assault Center, Mr. Watson sent a letter to all law enforcement agencies within the District reminding them that Colorado law prohibited the disclosure of sexual assault victims' names to non-criminal justice agencies.  Mr. Watson also sent a copy of his letter to Plaintiff, whom he had referenced by name in the June 7, 2006 letter.

Mr. Watson claims that the sole reason for sending the letter was to advise law enforcement agencies of the propriety of Plaintiff's purported request for victim identities.  Conversely, Plaintiff denies requesting the victim information.  She contends

16

that Mr. Watson had no basis to send the letter, which she felt accused her of engaging in criminal behavior.  Plaintiff claims Mr. Watson sent the letter in retaliation for her complaints against Defendant and that it harmed her professional reputation among the law enforcement community.  Indeed, the chief of the Ft. Morgan Police Department, Keith Kuretich, who received a copy of the letter felt that the letter was directing the Police Department not to work with the Assault Center based on the Center's association with Plaintiff.  In his impression, the letter implied that Plaintiff had done something illegal.

      C.    Termination From The Assault Center

The final event at issue in Plaintiff's claims occurred in August 2006.  The Assault Center terminated Plaintiff on August 1, 2006, telling her that it was not in the Center's best interest to continue with Plaintiff's employment.  Not surprisingly, the parties dispute the reason behind Plaintiff's termination.  Plaintiff claims that Defendant interfered with her employment and that she was terminated as a result of Defendant's retaliatory and discriminatory actions.  Indeed, board members of the Assault Center knew both Messrs. Watson and Jones and Ms. Torres, who was interviewed by Ms. Holloway, was on the Assault Center Board of Directors.  Further, the Assault Center received a copy of Mr. Watson's June 7, 2006 letter, and Virgie Nelson, the Assault Center Board President, even responded to Mr. Watson by letter on June 15, 2006.

However, those board members did not talk directly to Messrs. Jones or Watson about Plaintiff in the summer of 2006.  Moreover, the Assault Center's board of directors had some concerns regarding the lack of courtroom appearances by Plaintiff.  According to Ms. Nelson, the resulting negative effect on the Center's ability to raise grant monies, and not any action by Defendant, led to Plaintiff's termination.

Regardless, after she left the Assault Center, Plaintiff took a job as executive director of the Sexual Abuse Response Advocates ("Response Advocates").  Even at Response Advocates, Plaintiff claims to still feel the effect of Defendant's retaliation.  She alleges that Defendant continues to tarnish her reputation among law enforcement and points out that employees of Defendant have not attended training sessions taught by her, to the detriment of her career.

## VII.   PLAINTIFF'S EEOC CHARGES

Plaintiff acted quickly to report her complaints against Defendant.  First, she sent a letter to the Equal Employment Opportunity Commission ("EEOC") on April 3, 2006, detailing her complaints against Mr. Jones and Defendant.  Then, she filed her first Charge of Discrimination and an Intake Questionnaire with the EEOC on April 28, 2006.  She filed a first amended charge on May 9, 2006, and a second amended charge on July 10, 2006.  Each of the charges contain substantially similar allegations of a hostile work environment leading to a constructive discharge.

On August 1, 2006, Plaintiff sent the EEOC a letter requesting that the agency expedite her right to sue letter.  She also included a Supplemental Submission of

Supporting Facts and Law ("Supplemental Submission") that greatly expanded on the factual allegations in her earlier charges, and, for the first time, included allegations of post-employment retaliation.[11]  The EEOC issued a right to sue letter on December 1, 2006.

## PROCEDURAL HISTORY

Compared to the lengthy factual history, the procedural history of this case is relatively simple.  Plaintiff filed her Complaint on February 15, 2007, and Defendant answered on April 2, 2007.  Discovery included an occasional hiccup, but all of the discovery issues have been resolved and Defendant filed the instant Motion for Summary Judgment on May 30, 2008.  After some haggling between the parties over the briefing schedule, Plaintiff responded to Defendant's Motion with a rather prolix, 114-page response brief on August 20, 2008.  As if 114 pages were insufficient, on September 17, 2008, Plaintiff filed a supplemental response brief addressing only Defendant's Eleventh Amendment arguments.  Defendant then filed a reply in support of its Motion on October 31, 2008.  The Motion is now ripe for decision.

## STANDARD OF REVIEW

Courts should grant summary judgment if the record indicates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Deepwater Investments, Ltd. v. Jackson Hold*

---

[11]   She also sent Defendant a demand letter in June 2006 that explained some of her claims.

*Ski Corp.*, 938 F.2d 1105, 1110-11 (10th Cir. 1991); *Devery Implement Co. v. J.I. Case Co.*, 944 F.2d 724, 726 (10th Cir. 1991).  The moving party bears the initial burden of demonstrating the lack of an issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant meets this burden, the non-movant must respond with evidence sufficient to create a genuine issue of material fact for trial.  *Id.* at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  To overcome a motion for summary judgment, the non-moving party must present enough evidence to allow a reasonable jury to find in its favor.  *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993).  In analyzing the evidence on a motion for summary judgment, a court should view the factual record and draw reasonable inferences in favor of the non-moving party.  *Kidd v. Taos Ski Valley, Inc.*, 88 F.3d 848, 851 (10th Cir. 1995).

## DISCUSSION

The Court will address Plaintiff's claims in the order Plaintiff has presented them in her complaint, taking each of Defendant's arguments on a claim-by-claim basis.

## I.    FIRST CLAIM – UNLAWFUL RETALIATION

Plaintiff's first claim is for unlawful retaliation under Title VII.  She contends that Defendant retaliated against her after she complained about harassment and discrimination.  Notably, she argues that the retaliation began before she resigned and extended after her resignation.

A.     Post-Employment Retaliation

Defendant contends that Plaintiff's charges failed to properly notify the EEOC of her claims of post-employment retaliation.  As noted above, Plaintiff filed three charges of discrimination with the EEOC, she filed the first on April 28, 2006; the second on May 9, 2006; and the third on July 10, 2006.  However, none of the EEOC charges specifically alleged that Plaintiff had suffered post-employment retaliation.  Thus, Defendant argues that it is entitled to summary judgment on the retaliation claim because Plaintiff has failed to exhaust her administrative remedies.

1.     *Applicable Law – Exhaustion Of Administrative Remedies*

Before a Title VII plaintiff may proceed in federal court, she must exhaust her administrative remedies.  *See Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003). The exhaustion requirement protects employers by giving them notice of the allegations against them and provides the EEOC a chance to conciliate a plaintiff's claims before a lawsuit is filed.  *See Foster v. Ruhrpumpen, Inc.*, 365 F.3d 1191, 1195 (10th Cir. 2004). "The first step to exhaustion is the filing of a charge of discrimination with the EEOC." *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1183 (10th Cir. 2007).  The next step is to determine the scope of the allegations raised in the charge of discrimination because those allegations generally control the scope of the federal lawsuit.  *Id.* at 1186 (citing *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005)).

The Tenth Circuit liberally construes charges filed with the EEOC to determine whether a plaintiff has satisfied her administrative exhaustion requirements.  *Jones*, 502

F.3d at 1186; *Foster*, 365 F.3d at 1195.  However, each occurrence of discriminatory

conduct constitutes a separate "unlawful employment practice."  *Martinez*, 347 F.3d at

1210.  Thus, to properly exhaust her administrative remedies and avail herself of the full

scope of her allegations, an employee should report each discrete discriminatory act to

the EEOC.  *See, e.g., id.*; *see also Woodman v. Runyon*, 132 F.3d 1330, 1341 (10th

Cir. 1997).  Failure to do so may result in dismissal or summary judgment against the

employee on those claims.  *Martinez*, 347 F.3d at 1211.

2.    *Plaintiff Exhausted Her Administrative Remedies*

Defendant argues that Plaintiff failed to raise the issue of post-employment

retaliation in her three EEOC charges.  More specifically, Defendant contends that

Plaintiff has failed to exhaust her administrative remedies with regard to:  (1) the May 5,

2006 Agency Findings; (2) Mr. Watson's June 7, 2006 letter to the law enforcement

agencies in the 13th Judicial District; and (3) Defendant's alleged interference with her

employment at the Assault Center.  Plaintiff concedes that her EEOC charges lacked

any allegation of post-employment retaliation, but contends that she did inform the

EEOC of her post-employment retaliation claim in her August 1, 2006 Supplemental

Submission.  Plaintiff argues that the Supplemental Submission provided notice of the

post-employment retaliation to both the EEOC and Defendant, and, thus, served the

purposes of administrative exhaustion.

The Court agrees with Plaintiff, and concludes that her filing of the Supplemental

Submission remedies any failure on her part to exhaust the post-employment retaliation

claims in an official charge of discrimination.  A number of facts support the Court's decision.  First, Plaintiff could not have described her allegations of post-employment retaliation in the first two charges of discrimination because she filed the first charge before any of the alleged post-employment retaliation had occurred, and the second charge before Mr. Watson sent his June 7, 2006 letter regarding the victims of sexual abuse crimes.  Even the third charge was filed before Plaintiff had been terminated from the Assault Center.  Thus, she had no reason to suspect that Defendant had interfered with her employment, as she now alleges.  In contrast to her charges of discrimination, Plaintiff filed the Supplemental Submission after she learned of the three incidents that form the backbone of her post-employment retaliation claim.

Second, the Supplemental Submission explicitly referenced Plaintiff's earlier charges, thereby allowing the EEOC and Defendant to trace the Supplemental Submission to Plaintiff's pending claim.  Critically, Defendant does not dispute that it received notice of the Supplemental Submission before filing its Position Statement with the EEOC.  Therefore, Defendant knew of Plaintiff's post-employment retaliation claims before it was required to respond to Plaintiff's allegations.

The Court should also point out that the Supplemental Submission provided a more detailed description of Plaintiff's claims than her earlier charges of discrimination.  Thus, if notice of an employee's claims is the primary goal behind requiring administrative exhaustion, Plaintiff's Supplemental Submission actually served this purpose far better than her three charges of discrimination.

23

Admittedly, Plaintiff cannot explain why she did not follow the usual channels by submitting a fourth charge of discrimination.  However, the Court will not deny Plaintiff her day in court because of a slight deviation from the normal bureaucratic process. Since the Supplemental Submission served the key purposes of the administrative exhaustion requirement, the Court sides with function over form and deny summary judgment on this portion of her retaliation claim.

B.     Adverse Employment Action And Causation

Defendant also argues that it is entitled to summary judgment on Plaintiff's retaliation claim because Plaintiff lacks sufficient evidence to support two necessary prongs of her *prima facie* claim of retaliation:  (1) an adverse employment action and (2) a causal connection between the adverse action and Plaintiff's protected activities.

1.     *Applicable Law – Retaliation Framework*

A plaintiff can prove retaliatory treatment by direct or circumstantial evidence. *See Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008); *Bullington v. United Airlines, Inc.*, 186 F.3d 1301, 1320-21 (10th Cir. 1999). When, as here, a plaintiff relies largely on circumstantial evidence of retaliation, the Supreme Court has directed courts to apply a three-step, burden shifting analysis to determine whether summary judgment is appropriate.  *See McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under *McDonnell-Douglas*, the plaintiff has the initial burden to present a *prima facie* case of retaliation.  *See id.*; *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d

1220, 1226 (10th Cir. 2000). If a plaintiff can make out a *prima facie* case, the burden

shifts to the employer to show a legitimate business reason for its actions. *McDonnell-*

*Douglas*, 411 U.S. at 806; *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 529

(10th Cir. 1994). If the employer can offer such a reason, the case should be dismissed

on summary judgment unless the plaintiff can show that the proffered reason was

merely a pretext for retaliation or discrimination. *Garrett v. Hewlett-Packard Co.*, 305

F.3d 1210, 1216 (10th Cir. 2002). A plaintiff may show pretextual motive by producing

evidence which demonstrates that the employer's proffered reason for acting adversely

is "unworthy of belief." *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136,

1146 (10th Cir. 2008) (citing *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir.

1995)). This framework applies whether a plaintiff seeks relief under Title VII, 42 U.S.C.

§ 1983, or § 1981. *Kendrick*, 220 F.3d at 1226 and n.4 (citing *Perry v. Woodward*, 199

F.3d 1126, 1135 (10th Cir. 1999) and *Drake v. City of Ft. Collins*, 927 F.2d 1156, 1162

(10th Cir. 1991)). Regardless of the burden shifting analysis, courts should keep in

mind that, at all times, the employee retains the burden of proving that her employer

intentionally retaliated against him. *Adamson*, 514 F.3d at 1145.

To state a *prima facie* case for unlawful retaliation, a plaintiff must show that:

(1) she engaged in protected opposition to discrimination; (2) she was subjected to an

adverse employment action; and (3) a causal connection exists between the protected

activity and the adverse action. *Kendrick*, 220 F.3d at 1234; *see also Vaughn v.*

*Epworth Villa*, 537 F.3d 1147, 1150 (10th Cir. 2008). Defendant does not dispute that

Plaintiff has addressed the first element, but disputes the second and third elements, adverse employment action and causation.

Regarding the second *prima facie* prong, the Tenth Circuit liberally defines "adverse employment action." *Wells*, 325 F.3d at 1212-13.  However, the Tenth Circuit's definition must be viewed in light of recent clarification of this prong by the Supreme Court in *Burlington N. & Santa Fe Ry Co. v. White*, 548 U.S. 53 (2006).  Under *Burlington Northern*, an employee "must show that a reasonable employee would have found the employer's action materially adverse such that they might be dissuaded from making a charge of discrimination."  *See id.* at 1213; *cf. Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").  Courts determine whether an employment action is adverse on a case-by-case basis.  *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998); *Jeffries v. Kansas*, 147 F.3d 1220, 1232 (10th Cir. 1998).  And, as the Supreme Court's use of the word "reasonable" suggests, courts should apply an objective standard.  *Williams v. W.D. Sports*, 497 F.3d 1079, 1088 (10th Cir. 2007).

Regarding the third *prima facie* prong, causation, a plaintiff must come forward with evidence that justifies an inference of retaliatory motive, "such as protected conduct closely followed by adverse action."  *Proctor v. U.P.S.*, 502 F.3d 1200, 1208 (10th Cir. 2007).  Lacking evidence of a "*very close*" temporal connection between the employee's

protected conduct and adverse action, a plaintiff must present additional evidence to establish causation.  *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (emphasis in original); *see also Piercy v. Maketa*, 480 F.3d 1192, 1198-99 (10th Cir. 2007).

     2.    *Plaintiff Can Establish A Prima Facie Case Of Retaliation*

     a.    <u>*Adverse employment action*</u>

In its first argument on this point, Defendant contends that Plaintiff repeatedly complained to Mr. Watson about alleged discrimination and harassment, first in April 2005 and again in February and March 2006.  Thus, Defendant argues that Plaintiff was not dissuaded from complaining about discrimination or harassment as a result of Mr. Jones' conduct, and under *Somoza v. University of Denver*, 513 F.3d 1206 (10th Cir. 2008), this fact reflects that a reasonable employee would not have found Mr. Jones' conduct to be adverse and material.

However, the Court concludes that Defendant applies *Somoza* (and *Burlington Northern*) too broadly.  In *Somoza*, the employees at issue lodged numerous informal and formal complaints with their superiors.  513 F.3d at 1214-15.  These complaints led the Tenth Circuit Court of Appeals to note that an employee's repeated complaints "may shed light as to whether the actions are sufficiently material and adverse to be actionable."  *Id.* at 1214.

In contrast to *Somoza*, Plaintiff complained once to Mr. Watson about Mr. Jones in April 2005, and again approximately one year later in February and March 2006.

Perhaps if Plaintiff had lodged repeated complaints with Mr. Watson, the Court's decision would change, but, unlike *Somoza*, Plaintiff's complaints in this case do not necessarily reflect that a reasonable employee would be unfazed by Defendant's actions.  As such, the Court concludes that Plaintiff may present her allegations of retaliatory conduct to a jury and let the jury decide whether a reasonable employee would have been dissuaded from filing a charge of discrimination by Mr. Jones and Mr. Watson's conduct.

In its second argument on this point, Defendant contends that none of Defendant's alleged conduct, *e.g.*, Mr. Jones' behavior towards Plaintiff around the office after the April 2005 disagreement, his comments about her trip to Las Vegas, the video at the 2005 Christmas party, Messrs. Watson and Jones' overbearing questions and requests regarding Plaintiff's job duties and functions, and the internal investigation of her complaints, rise to a sufficient level of materiality and adversity to meet the second *prima facie* prong.

Plaintiff responds that Defendant's actions should not be singled out for analysis on a one-by-one basis, and the Court should view Defendant's conduct as having a cumulative effect.  Plaintiff further contends that she has alleged far more offensive conduct than trivial outbursts or generic ridicule by co-workers, and that Defendant targeted her for individual harassment and discrimination.

Viewing the facts in the record in a light favorable to Plaintiff, the Court concludes that Plaintiff has presented sufficient evidence to make out a *prima facie* case.

Regarding Mr. Watson and Mr. Jones' alleged retaliatory conduct, Plaintiff has alleged that both men continually asked her to justify her job functions in a manner that was missing from Mr. Watson or Mr. Jones' supervision of other employees.  Plaintiff also alleges Mr. Jones ridiculed her job role, gender and personal life to numerous employees around the office.  In contrast to Defendant's arguments, these targeted actions reflect more than general impolite behavior and would allow a reasonable juror to find in Plaintiff's favor.

Additionally, the evidence in the record indicates that Defendant began the internal investigation of Plaintiff's allegations with two strikes against Plaintiff's credibility.  To wit, Mr. Watson's communications with Plaintiff regarding the investigation imply that Mr. Watson put far more stock into Mr. Jones' version of the story than he put into Plaintiff's version of the story.  The tenor of Ms. Holloway's investigation and interviews suggest that she, too, started from the position that Plaintiff was lying and Mr. Jones was telling the truth.  For example, Ms. Holloway admitted that she told Plaintiff to just "move on" and forget about her complaint.  Defendant's failure to impartially investigate Plaintiff's claims of harassment are sufficiently adverse to allow a jury to find that the actions would dissuade a reasonable employee from reporting further harassment or discrimination.

Defendant's post-employment actions, *e.g.*, the June 7, 2006 letter to law enforcement agencies and disclosure of the Agency Findings to a local paper, also support Plaintiff's retaliation claim.  Although the legal advice in the June 7 letter is not

necessarily offensive or adverse, Plaintiff has presented evidence reflecting that members of the law enforcement community, like Mr. Kuretich, found the letter unwarranted and believed that it cast a negative light on Plaintiff's reputation.  Thus, even if Plaintiff had improperly requested the names of sexual abuse victims, the manner in which Mr. Watson went about notifying the various law enforcement agencies supports Plaintiff's retaliation claim.  Indeed, Mr. Watson could just as easily have drafted the letter without any reference to Plaintiff, but he chose to mention Plaintiff by name in the letter.  This fact, when viewed in a light favorable to Plaintiff, might lead a jury to conclude that Mr. Watson sought to use the letter as a backhanded way to retaliate against Plaintiff among the close-knit law enforcement community in the 13th District.

Defendant also ignores Plaintiff's allegation that Mr. Watson disclosed the May 5, 2006 Agency Findings to the Sterling *Journal-Advocate*, a newspaper in the 13th Judicial District.  Given the highly pejorative comments regarding Plaintiff and the sensitive nature of the topics discussed in the Agency Findings, disclosure of those unredacted Findings to a local paper could allow a jury to find that a Defendant had retaliated against Plaintiff in a manner adverse and sever enough to dissuade a reasonable employee from raising complaints of discrimination.

On the basis of the evidence cited above, the Court concludes that Plaintiff has presented enough instances of potentially unlawful and derogatory conduct by Defendant to satisfy the adverse employment action prong of her *prima facie* case.

    b.    *Causation*

Defendant next argues that, even if Plaintiff can establish an adverse employ-

ment action, only three acts might be severe enough to be considered materially

adverse:  (1) the Agency Findings; (2) Defendant's interference with Plaintiff's

employment at the Assault Center; and (3) Mr. Watson's refusal to send his staff to

Plaintiff's training seminar.  Defendant goes on to argue that Plaintiff cannot establish

a causal link between her protected actions and any of these three instances of

retaliatory conduct.

Initially, Defendant contends that the time gaps between the protected activity

and the allegedly retaliatory conduct is too long to imply a causal link.  However, the

Court disagrees, and finds that Plaintiff has presented evidence to establish a sufficient

causal connection between her protected activities and Defendant's alleged retaliation.

Even if the Court adopts Defendant's argument, ignores any instances of pre-

termination adverse employment actions, and assumes that the Agency Findings

constitute the first retaliatory adverse employment action, the Findings came out less

than two months after Plaintiff lodged her formal complaint with Mr. Watson and only

one month after Plaintiff sent Mr. Watson her resignation e-mail, in which she reiterated

her complaints.  This is a sufficiently small temporal gap between protected activity

and retaliatory action to survive summary judgment.  *See Piercy*, 480 F.3d at 1199

(declining to grant summary judgment on causation element when retaliatory conduct

followed plaintiff's protected activity by less than one month).

Moreover, although Defendant only addresses the temporal link between three of the alleged post-employment adverse actions, Plaintiff has alleged other instances of retaliatory conduct that followed closely on the heels of other protected activity.  By way of example, Mr. Jones refused to work on cases with Plaintiff, and Messrs. Jones and Watson assigned Plaintiff unnecessary projects immediately after Plaintiff's April 2005 complaint about Mr. Jones.  A second example of pre-termination retaliatory conduct would be Mr. Watson and Ms. Holloway's allegedly one-sided investigation less than two weeks after Plaintiff's complaint to Mr. Watson in March 2006.

The tight temporal gaps between the various instances of protected conduct and the potentially retaliatory conduct preclude summary judgment on the causation prong of Plaintiff's *prima facie* case.

### 3.    *Pretextual Motive*

Defendant also attacks the third step of the *McDonnell Douglas* framework. It argues that it had a legitimate non-discriminatory reason to initiate the 2006 investigation into Plaintiff's allegations, conduct the investigation with Ms. Holloway, and draft the Agency Findings, and that Plaintiff has not come forward with evidence to establish that the Defendant's reasons for taking these actions was merely pretextual or unworthy of belief.

However, the Court disagrees and concludes that Defendant has not presented a sufficient non-discriminatory reason to explain each of its retaliatory actions.  For example, although Defendant had legitimate reasons to initiate the investigation, *i.e.*,

Plaintiff and Mr. Jones' complaints, Defendant has not come forward with any evidence to explain the seemingly biased nature of the inquiry.  Defendant contends that Plaintiff may disagree with Ms. Holloway's style may have made Plaintiff uncomfortable, but that is not enough to imply retaliation.  However, even Ms. Holloway admitted that she had a personal interest in the outcome of her investigation and that she was confrontational with Plaintiff during her interviews.  Ms. Holloway's deposition testimony reflects that she thought Plaintiff should simply move on, rather than pursue her complaint. Likewise, the tone of Mr. Watson's communications with Plaintiff reflect that he had already made up his mind regarding Plaintiff's claims before the investigation had begun.  Thus, contrary to Defendant's argument, a jury could find that the biased tone of the investigation into Plaintiff's complaint indicates that Mr. Watson and Ms. Holloway did not act in good faith, but out of retaliation for Plaintiff's allegations against Defendant.  In short, a jury could find that the investigation was a pretextual cover to vindicate the nearly wholesale adoption of Mr. Jones' version of the events in the Agency Findings.

Further, the manner in which Defendant disclosed the Agency Findings to the public in unredacted form precludes summary judgment.  Defendant provided a copy of the Agency Findings to the county commissioners and the Sterling *Journal-Advocate*, but has not explained why such a sensitive report containing what appears to be

confidential personnel information of a former employee was disclosed to the press.[12]

The only excuse that Defendant offers on this point is that the Office Policy Manual

does not guaranty confidentiality of items like the Agency Findings.  The Office Policy

Manual may not prohibit disclosure, but this is not sufficient reason to disclose sensitive

and confidential personnel information to the public.

Notwithstanding the fact that Defendant had a non-retaliatory reason to initiate

the investigation, Defendant has not provided a legitimate non-retaliatory reason to

justify the one-sided nature of the inquiry and Defendant's disclosure of the Agency

Findings to the local newspaper.  Therefore, for the reasons noted above, the Court

finds that Defendant has not met its burden on the second stage of the *McDonnell*

*Douglas* framework to present a legitimate non-discriminatory reason for each of the

potentially retaliatory actions.[13]

## II.    SECOND CLAIM – SEXUAL HARASSMENT

Plaintiff's second claim is labeled, "Sexual Harassment," and appears to allege

that Plaintiff suffered harassment in the form of a hostile work environment.  Defendant

---

[12]   Indeed, the Court questions whether Defendant, in disclosing the Agency Findings to the public has violated any confidentiality provisions of the Colorado Open Records Act or other laws protecting confidential personnel information.

[13]   Because, for purposes of this Order, the Court concludes that Plaintiff has presented enough evidence relating to causation on the basis of the Agency Findings, it need not address Defendant's other arguments regarding the alleged interference with Plaintiff's employment at the Assault Center or Mr. Watson's decision not to send his employees to Plaintiff's training seminar.

moves for summary judgment on this claim on the basis of untimeliness and the substantive elements of the claim.

A.    Mr. Jones' December 2003 and January 2004 Conduct

Defendant contends that Plaintiff's allegations regarding Mr. Jones' conduct in December 2003 and January 2004 are time-barred because the conduct falls outside of the applicable 180- or 300-day window for Title VII claims.

1.    *Applicable Law – Title VII Statutes Of Limitations*

Typically, a plaintiff must file a charge of discrimination with the EEOC within either 180 or 300 days of the occurrence of "unlawful employment practice." *See* 42 U.S.C. § 2000e-5(e)(1). If a plaintiff does not file her grievance with a state employment entity that has the authority to grant relief or seek criminal remedies relating to an unlawful employment practice, the 180-day rule applies. *Id.* If she does file her grievance with such an entity, the 300-day rule applies. *Id.*

Discrete unlawful employment practices, such as a termination, failure to promote, or refusal to hire occur once, on the day that the termination, failure to promote, etc., occurs. *See Tademy v. Union Pac. Corp.*, 520 F.3d 1149, 1156 (10th Cir. 2008) (citing *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002)). A plaintiff cannot recover for discrete retaliatory or discriminatory acts that occur outside of the 180- or 300-day deadline. *See Morgan*, 536 U.S. at 113 ("discrete discriminatory acts are not actionable if time barred").

However, a hostile work environment claim, by its nature, involves a series or pattern of discrete acts occurring over a period of time that may last days or years and may even outlast the statutory time periods in 42 U.S.C. § 2000e-5(e)(1).  *Morgan*, 536 U.S. at 117 ("A hostile work environment claim is composed of a series of separate acts that collectively constitute on 'unlawful employment practice.'"); *Duncan v. Manager, Dep't of Safety, City & County of Denver*, 397 F.3d 1300, 1309 (2005).  As the Supreme Court has pointed out, the nature of hostile work environment claims means that they do not fit neatly within the "unlawful employment practice" time-period framework because the hostile environment is not a discrete act.  *Morgan*, 536 U.S. at 115 (noting that hostile work environment claims are "different in kind from discrete acts").  Thus, the Supreme Court has held that:

> It does not matter, for purposes of the statute, that some component acts of the hostile work environment fall outside of the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire period of the hostile environment may be consider by a court for purposes of determining liability.

*Id.* at 117.

In order to take advantage of *Morgan* and bootstrap untimely discrete events to otherwise timely discrete acts in hostile work environment claim, a plaintiff must show a sufficient relationship between the untimely events and the timely events.  *See Duncan*, 397 F.3d at 1309 (citing *Morgan*, 536 U.S. at 120).  In other words, the plaintiff must show that the untimely acts were a component of the same hostile work environment created by the timely acts.  *See Tademy*, 520 F.3d at 1156 (citing *Duncan*, 397 F.3d

at 1309).  To determine whether a sufficient relationship exists, courts should look to

three factors:  (1) did the timely and untimely events involve the same type of acts;

(2) how frequently did the acts occur; and (3) were the acts perpetrated by the same

people?  *See Morgan*, 536 U.S. at 120; *Duncan*, 397 F.3d at 1309.

> 2.    *A Genuine Issue Of Fact Exists Regarding Whether Mr. Jones'*
> *December 2003 And January 2004 Actions Contributed To A*
> *Hostile Work Environment*

Defendant contends that Plaintiff filed a charge with the EEOC on April 28, 2006

and calculates that Plaintiff cannot recover for unlawful employment practices occurring

180 days before Plaintiff filed her charge, or any events prior to October 30, 2005.[14]

Thus, Defendant argues that Plaintiff cannot use Mr. Jones' alleged harassment of

Plaintiff in December 2003 and January 2004 to support her Title VII claims because the

harassment falls outside of the time period and is not sufficiently related to the events

that compose Plaintiff's hostile work environment claim.

> a.    *The types of acts*

Regarding the first *Morgan* factor, Defendant contends that the acts allegedly

perpetrated by Mr. Jones in December 2003 and January 2004 differ dramatically from

the acts that occurred after October 30, 2005.  Defendant argues that Mr. Jones' early

harassment involved unwanted pursuit of a romantic or physical relationship with

Plaintiff; whereas the later, timely conduct involved cold, unprofessional behavior that

---

[14]   Plaintiff contends that the actual date of the first EEOC charge is May 8, 2008
and that the 300-day rule should apply.  However, the Court need not resolve these disputes
because it is immaterial to Defendant's arguments – under either the 180- or 300-day rule,
Mr. Jones' December 2003 and January 2004 conduct is technically untimely.

went more towards Plaintiff's professional life and work reputation.  Under Defendant's view, the untimely hostile work environment consisted of too much of Mr. Jones' attention, and the timely hostile work environment consisted of not enough of his attention.

However, as Plaintiff points out, her hostile work environment claim does not turn solely on Mr. Jones' unwanted romantic advances, but also on his alleged discussions and statements of a sexual nature regarding Plaintiff with other employees in the office. For example, Marilyn Malone, one of Plaintiff's co-workers, stated that she first became aware of Mr. Jones "saying things about" Plaintiff to other employees sometime prior to December 2003.[15]  Ms. Malone also told Plaintiff about comments she had heard from Mr. Jones regarding Plaintiff.  It appears that Mr. Jones continued to discuss Plaintiff in a sexual manner with co-workers, namely Mr. Costigan, in late 2004 or very early 2005, and again in March or April 2006.  Thus, although Mr. Jones may have halted his pursuit of a physical relationship with Plaintiff in January 2004, a reasonable jury could find that he contributed to the hostile work environment by continually discussing Plaintiff in a sexual manner with co-workers from 2003 through 2007.

---

[15]   Defendant objects to the use of Ms. Malone's statement on hearsay grounds. However, Plaintiff is not citing to Ms. Malone's testimony for the truth of the matter asserted, *i.e.*, it does not matter whether or not Mr. Jones really did want to lay down on the couch with Plaintiff, but instead for its effect on the listener, Ms. Malone, and the state of mind of the speaker, Mr. Jones.

b.    *Frequency of the acts*

Regarding the second *Morgan* factor, Defendant argues that Mr. Jones'

December 2003 and January 2004 acts occurred in a distinct time period and a large

interlude existed before Mr. Jones became rude, unprofessional, unwilling to work with

Plaintiff or the other victim advocates.  However, Plaintiff has presented evidence

showing that Mr. Jones' harassing conduct, although it may have shifted slightly in

terms of his treatment of Plaintiff, did not cease altogether in January 2004 and then

recommence in 2005.  For example, Mr. Adams stated that during his tenure as district

attorney (*i.e.*, prior to Mr. Watson's taking office in 2005), Mr. Jones made numerous

sexist comments regarding female victim advocates and the Colorado Organization for

Victim Advocates, a group to which Plaintiff belonged.  Additionally, Mr. Costigan's

testimony regarding Mr. Jones' statements reflects that Mr. Jones was discussing

Plaintiff in a sexual manner with co-workers sometime in late 2004 or early 2005.  Thus,

evidence shows that Mr. Jones' harassing comments continued with relative frequency

from roughly December 2003, up through at least October 30, 2005.  A reasonable jury

could conclude that his Mr. Jones "bad acts" occurred with enough frequency to allow a

jury to find that the December 2003 and January 2004 acts contributed to the potentially

hostile work environment that existed after October 30, 2005.

c.    *Same managers or employees*

Regarding the third *Morgan* factor, Defendant argues that the December 2003

and January 2004 harassment involved only Mr. Jones, whereas the hostile work

39

environment that existed after October 30, 2005 involved Mr. Jones, Mr. Watson, and other coworkers like Ms. Holloway.  Defendant contends that the participation of new individuals should result in exclusion of Mr. Jones' earlier conduct.  However, Mr. Jones took part in both the untimely and timely practices that make up Plaintiff's hostile work environment claim.  Moreover, contrary to Defendant's argument, the addition of new harassing or discriminatory actors later in time does not somehow render earlier discrimination moot or non-actionable when it otherwise contributes to a hostile work environment.  Indeed, as *Tademy* noted, if strict continuity between actors was required to state a hostile work environment claim, an employer could escape liability by employing a "legion" of sexists and then directing them to coordinate their harassment so as to game the statutory time period.

The Court concludes that Mr. Jones' untimely conduct in December 2003 and January 2004, is sufficiently related to the conduct that occurred after October 30, 2005, because the untimely conduct was similar to the timely conduct, occurred with relative frequency and involved the same discriminatory actor throughout.  Thus, the Court will deny summary judgment on this aspect of Plaintiff's claim and allow Plaintiff to present relevant evidence of Mr. Jones' December 2003 and January 2004.

B. <u>Defendant's Substantive Arguments Regarding Hostile Work Environment</u>

Defendant also argues that it is entitled to summary judgment because Plaintiff cannot present sufficient evidence to raise a triable issue of fact on whether the alleged

discrimination was gender-based and whether the environment was pervasive or severe enough to alter the terms of Plaintiff's employment.

1. *Applicable Law – Hostile Work Environment*

As noted elsewhere in this Order, not all workplace unpleasantries create an actionable claim under Title VII. *See Sprague v. Thorn Amers., Inc.*, 129 F.3d 1355, 1365 (10th Cir. 1997) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). However, an employer cannot create or allow an intimidating, hostile, or offensive environment that unreasonably interferes with a employee's work performance or terms of employment. *See Sprague*, 129 F.3d at 1365-66 (citing *Hirase-Doi v. U.S. West Comms., Inc.*, 61 F.3d 777, 782 (10th Cir. 1995)).

A hostile work environment claim has four elements:  (1) the plaintiff belongs to a protected group; (2) she was subject to unwelcome harassment; (3) based on sex; and (4) due to the harassment's severity or pervasiveness, it altered the terms, privileges, or conditions of her employment and created an abusive working environment. *See Dick v. Phone Directories Co., Inc.*, 397 F.3d 1256, 1262-63 (10th Cir. 2005); *see also Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007) (same); *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1537 (10th Cir. 1995) ("Any harassment of an employee 'that would not occur but for the sex of the employee . . . may, if sufficiently patterned or pervasive, comprise an illegal condition of employment under Title VII.") (omission in original) (quoting *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir. 1987)).

41

2.     *Harassment Based On Gender*

Defendant argues that Plaintiff's hostile work environment theory depends almost entirely on Mr. Jones' brusque conduct and, since he directed his conduct at both men and women, Plaintiff cannot establish the third element of her claim.  However, Defendant completely ignores the fact that Mr. Jones and Plaintiff are of opposite sexes and he was more than "brusque" with Plaintiff.  In fact, it is undisputed that he pursued her romantically and, when the romantic and/or physical behavior ceased, Mr. Jones continued to harass Plaintiff.  Plaintiff alleges and provides evidence to support the idea that Mr. Jones' later mistreatment of Plaintiff stemmed solely from the failed romantic pursuit.

Conversely, Defendant has not come forward with any evidence to rebut this allegation, but relies instead on the rather lame argument that Mr. Jones used vulgar language to describe both men and women.  What this argument ignores, however, is that Mr. Jones did not physically pursue both men and women in the office, just Plaintiff. In other words, Plaintiff has raised a question of fact relating to the issue of whether Mr. Jones harassed Plaintiff because of her refusal to participate in a romantic relationship with him.  This is a classic case of sexual harassment based on gender, and the fact that Mr. Jones also castigated male employees does not somehow remove the sexual animus from his conduct towards Plaintiff.  *See Harsco*, 475 F.3d at 1186 (noting that an inference of gender based discrimination is "easy to draw" if the

harassment involves proposals of sexual activity) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

Defendant also contends that Mr. Watson's decision regarding relocation of the victim services offices and showing of the allegedly offensive video at the 2005 Christmas party were gender neutral.  Plaintiff responds that she believes the Christmas party video was an attempt to poke humor at her relationship with Mr. Jones, an unsupported contention the Court finds slightly dubious.  However, the Court's denial of summary judgment on this claim does not turn solely on either of these gender-neutral events, but rather on the cumulative effect of Mr. Jones' conduct over the years and additional events involving Mr. Watson and Ms. Holloway that Defendant does not address.  *See Penry v. Federal Home Loan Bank of Topeka*, 155 F.3d 1257, 1262 (10th Cir. 1998) (courts should eschew a "mechanical approach" to analyzing a hostile work environment claim and examine "the totality of circumstances").  Thus, the apparent gender neutrality of these two events does not wash away the other instances of gender-based harassing or discriminatory conduct.

        3.     *Sufficiently Pervasive Or Severe*

Defendant also argues that Plaintiff has not presented sufficient evidence to allow a reasonable jury to conclude that the harassment was pervasive or severe enough to sustain liability.  To determine whether a hostile work environment is sufficiently egregious to be actionable under Title VII, this Court must review the context of the challenged acts and examine the totality of the circumstances that comprise the

allegedly hostile environment.  *See id.*, (citing *Meritor*, 477 U.S. at 69).  "Indeed, the very term 'environment' indicates that the allegedly discriminatory incidents should not be examined in isolation."  *Penry*, 155 F.3d at 1262.

Based on the totality of the circumstances, the Court concludes that Plaintiff has presented sufficient evidence to survive summary judgment.  The Court will not rehash each of the challenged actions that may have contributed to the hostile environment, but it suffices to say that Plaintiff presents evidence of numerous instances of rather revolting behavior by Mr. Jones.  A short list includes the failed romantic pursuit in December 2003 and January 2004, his tirade against her in April 2005, and his comments regarding sexual relations with Plaintiff to Mr. Costigan.  These instances of discriminatory conduct raise a question of fact for the jury.  Moreover, when the Court adds Mr. Watson's later behavior to the environment, like his decision to show the explicit video at the 2005 Christmas party and his handling of the internal investigation in March 2006, the totality of circumstances reflect that the harassment directed towards Plaintiff was severe, pervasive and quite possibly altered the terms, conditions or privileges of Plaintiff's employment.

C.    Constructive Discharge[16]

Defendant argues that Plaintiff cannot sustain a constructive discharge theory of liability under her retaliation or discrimination claims because she has not established that her working conditions were so intolerable that a reasonable person would have resigned.

1.    *Applicable Law – Constructive Discharge*

To succeed on a claim for constructive discharge on the basis of discrimination or hostile environment, a plaintiff must show that "the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *Sanchez*, 164 F.3d at 534 (citing *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 (10th Cir. 1986)); *see also Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004). "There is no mathematically precise test of what is intolerable." *Hogue v. MQS Inspection, Inc.*, 875 F. Supp. 714, 723 (D. Colo. 1995). Courts should look at all of the circumstances, including: frequency of the conduct, severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Essentially, the plaintiff must show that discrimination or harassment made the job so unbearable that

---

[16] Plaintiff does not actually plead a claim for "constructive discharge" in her complaint. However, Defendant correctly points out that such a claim is implicit in Plaintiff's retaliation claim and Plaintiff mentions the idea of constructive discharge repeatedly in her pleadings and EEOC filings. Therefore, the Court will address the parties' arguments as though Plaintiff had presented a constructive discharge claim as part of her retaliation and/or discrimination claim.

her only reasonable choice was to quit.  *See Sanchez*, 164 F.3d at 534; *see also Sandoval v. City of Boulder*, 388 F.3d 1312, 1325 (10th Cir. 2004).  The standard for constructive discharge is objective, "an employee's subjective feelings or beliefs are not relevant in a constructive discharge claim."  *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 858 (10th Cir. 2000) (citing *Jeffries*, 147 F.3d at 1223).

> 2. *Plaintiff Has Provided Evidence To Survive Summary Judgment On A Constructive Discharge Claim*

Defendant contends that Plaintiff's constructive discharge claim cannot survive summary judgment for three reasons.  First, Defendant argues that Plaintiff has failed to establish that a reasonable person would have resigned under Defendant's working conditions.  Second, Defendant argues that Plaintiff relies on her own subjective belief to support her claim.  Third, Defendant argues that Plaintiff resigned before allowing Defendant to address her concerns with the work environment.

Plaintiff responds that she has alleged facts sufficient to survive summary judgment because the totality of Defendant's conduct left her with no reasonable choice but to resign, lest she face further humiliation, discrimination, and professional character assassination.

> a. <u>*Plaintiff can satisfy the constructive discharge standard*</u>.

Defendant attempts to paint Plaintiff's allegations with a non-discriminatory brush.  That is, Defendant contends that Plaintiff's resignation was based primarily on Mr. Jones' workplace incivility, rather than sexual harassment and gender discrimination, and that Title VII is not implicated by Plaintiff's allegations.  Defendant

argues that "[p]rofessional disagreements, a chilly attitude from Mr. Jones and coworkers, abrasive or rude behavior, and incivility in meetings are not the type of conduct that Title VII is designed to prevent."  But, by ignoring the sexual harassment and discrimination underlying each of Plaintiff's allegations, Defendant has missed the crux of Plaintiff's claim.

Indeed, Plaintiff has alleged more egregious and discriminatory conduct than Defendant cares to admit.  For example, although Defendant describes Mr. Jones behavior as chilly, rude, and abrasive, and attempts to portray him as acting like a jerk to all employees, Defendant fails to acknowledge that Mr. Jones repeatedly described women, including victim advocates like Plaintiff, as "bitches," "whores," or worse. Mr. Jones' frequent use of harassing and discriminatory language, indeed, the worst language imaginable, raises a question for the jury to decide whether a reasonable person in Plaintiff's shoes would feel not just uncomfortable, but compelled to resign. Moreover, given the breakdown of their personal relationship and Plaintiff's rejections of Mr. Jones' physical advances, a reasonable jury could determine that Mr. Jones' misogyny had Plaintiff as its primary target.  This inference, viewed in a light favorable to Plaintiff, further supports allowing Plaintiff to present a constructive discharge theory to the jury.

Defendant further argues that Plaintiff's disputes with Mr. Jones were simply "professional disagreements," not discrimination.  However, Plaintiff has provided evidence indicating that Mr. Jones' interference with Plaintiff's job role stemmed in part

from the animus he carried over from the unraveling of their personal relationship in December 2003 and January 2004, and not from any actual disagreement over how victim advocate programs should work.  Indeed, the causal link between Mr. Jones' harassment of Plaintiff and their earlier relationship is supported by Mr. Jones' statements to Mr. Costigan and Mr. Adams regarding physical relations between Plaintiff and Mr. Jones; obviously, Mr. Jones still carried some of the baggage of his attempted personal relationship with Plaintiff into 2005 and 2006.  Thus, Plaintiff has alleged facts to create a jury question regarding whether Mr. Jones' interference with Plaintiff's job functions falls under the umbrella of discrimination and harassment, rather than mere professional disagreement.

Additionally, and perhaps more critically to the question of whether a reasonable person would feel compelled to resign, Plaintiff has shown that Mr. Jones and other employees created an environment that substantially interfered with the performance of her job functions.  For example, Mr. Jones refused to work with Plaintiff after their disagreement in April 2005, a serious disruption of the conditions of her employment. Plaintiff also points out that Mr. Jones delayed approving one of her check requests and, along with Mr. Watson, created busy work for her to do.  These are real disruptions in the terms and conditions of Plaintiff's employment and they would allow a jury to conclude that a reasonable person in Plaintiff's position had no choice but to resign.[17]

---

[17]   Plaintiff's decision to move up her last day of employment is also supported by the tenor of the investigation being led by Mr. Watson and Ms. Holloway.

For these reasons, the Court concludes that Plaintiff has raised a question of fact regarding whether Mr. Jones and Mr. Watson's conduct would compel a reasonable person to quit. Therefore, summary judgment is denied on this aspect of Plaintiff's constructive discharge claim.

b.    *Plaintiff's subjective beliefs*

Defendant contends that Plaintiff relies on subjective beliefs to support her claim for constructive discharge. Then, citing the fact that the constructive discharge standard is an objective one, Defendant posits that Plaintiff's reliance on her own, subjective beliefs requires the Court to grant summary judgment.

However, Defendant's argument on this point reads far too much into the nature of the objective standard. The Court held in the preceding subsection that Plaintiff has raised a question of fact regarding whether the Defendant's work environment, and, specifically, Mr. Jones' conduct would compel a reasonable employee to quit. In other words, the Court concluded that Plaintiff presented enough objective evidence to allow her to present a constructive discharge claim to the jury. The mere fact that Plaintiff buttresses her constructive discharge claim with statements regarding her own feelings does not cancel out evidence that otherwise supports her claim from an objective point of view. Therefore, summary judgment on this aspect of Plaintiff's claim is denied.

c.    *Preemptive resignation*

Defendant's third argument for dismissal of Plaintiff's constructive discharge claim is that Plaintiff resigned before Defendant had the opportunity to complete its

internal investigation, and before Mr. Watson announced his decision on the contentious issue of where to locate Plaintiff's office.

However, the cases cited by Defendant in support of this argument differ fundamentally from the facts of this case. In *EEOC v. PVNF, LLC*, 487 F.3d 790, 805-06 (10th Cir. 2007), the EEOC alleged that the defendant had discriminated against female employees at a car dealership by, among other things, instituting a new salary and commission scheme that negatively affected a female employee more than a male employee at the dealership. The Tenth Circuit Court of Appeals concluded that the EEOC had not met its burden on the constructive discharge claim because, in part, the employee resigned prior to learning the "precise effect" of a new, allegedly discriminatory salary plan. *Id.* at 806. Thus, the court affirmed the district court's entry of judgment as a matter of law dismissing the constructive discharge claim. *Id.*

Likewise, in *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221-22 (10th Cir. 2002), the Tenth Circuit Court of Appeals affirmed summary judgment for an employer on an employee's constructive discharge claim. The plaintiff contended that he was forced to resign because the defendant had intimidated him, causing him to suffer poor performance evaluation, and begun the process of transferring him to a different job. *Id.* With very little discussion, the appellate court noted that the plaintiff had resigned before being transferred or learning the complete details of the new job position. *Id.* Thus, the court concluded that Plaintiff had not met his burden to show constructive discharge

because he did not know whether his new job would be worse, the same, or better than his current job.

Unlike the plaintiffs in *PVNF* or *Garrett*, Plaintiff in this case did not need to wait for the outcome of the investigation. Asking Plaintiff to wait for verdict on her formal complaint seems like a fruitless exercise under the facts alleged in this case because, as Plaintiff's evidence shows, she previously discussed the problems she had regarding Mr. Jones with Mr. Watson in April 2005, but her informal complaints had made matters worse, rather than better. Moreover, by the time she resigned, Plaintiff had already felt the full brunt of Mr. Jones' harassing and discriminatory conduct, and the final outcome of the investigation would not have undone the damage wrought by Mr. Jones that led her to resign. In other words, the conditions were sufficiently intolerable before the investigation to permit a jury to answer the question of whether Plaintiff suffered a constructive discharge.

Additionally, the fact that she did not wait for Mr. Watson's decision on where to move the victim advocate's office does not reflect a preemptive resignation. Indeed, Plaintiff was faced with two possible outcomes of the office relocation decision, both of them negative. If Mr. Watson kept the status quo and did not move Plaintiff into the same office as Mr. Jones, the situation would stay the same and Plaintiff would still be subject to the harassing and discriminatory environment she alleges had begun in October 2003, and had worsened since Mr. Watson's arrival. Had Mr. Watson decided to move Plaintiff into the same physical location as Mr. Jones, the obvious inference

one can dray is that matters would only have deteriorated further.  In other words, unlike the plaintiffs in *PVNF* or *Garrett*, Plaintiff knew the outcome of either option.  Further, the Court declines to endorse a policy that would require Plaintiff, who has already presented evidence reflecting that she suffered a discriminatory and hostile work environment, to wait for the outcome of a managerial decision that can only result in more discrimination and hostility before letting her turn to the protection of Title VII.  *See Harris*, 510 U.S. at 22 ("Title VII comes into play before harassing conduct leads to a nervous breakdown.").

Therefore, the Court concludes that Defendant has not carried its burden on any of the arguments regarding Plaintiff's constructive discharge claim.

## III.    THIRD CLAIM – DISCRIMINATION

Defendant argues that it is entitled to summary judgment on Plaintiff's third claim for sex discrimination because Plaintiff has not alleged any adverse employment actions taken by Defendant as a result of Plaintiff's gender.  Alternatively, Defendant argues that this claim is duplicative of Plaintiff's harassment claim because Plaintiff relies entirely on the same set of facts for both claims.

Although the Court agrees with Defendant that Plaintiff's discrimination claim cannot rest on post-employment actions by Defendant, and the discrimination claim is largely duplicative of the harassment claim, the Court concludes that summary judgment is inappropriate.

Regarding an adverse employment action, Defendant argues that none of discriminatory actions identified by Plaintiff during her employment rise to the level of adverse employment action because none of the actions caused a significant change in Plaintiff's employment status.  However, the Court views Plaintiff's claim to allege that Defendant's discrimination caused Plaintiff to suffer a constructive discharge, and, as the Court briefly explains, this allegation allows Plaintiff's discrimination claim to survive summary judgment.

In a Title VII discrimination case, courts can analogize constructive discharge to termination, since both events are essentially a forced cessation of employment caused by the employer.  *See Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005).  Moreover, it is well-settled that termination will sustain liability in a discrimination claim because it materially affects the terms of a plaintiff's employment.  *See Piercy*, 480 F.3d at 1203 (noting that adverse employment actions include "hiring, *firing*, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits") (emphasis added).  Thus, because the Court concludes that Plaintiff has presented sufficient evidence to survive summary judgment on her constructive discharge claim, the Court also concludes that Plaintiff has presented enough evidence to survive summary judgment on her discrimination claim.

Regarding the duplication issue, it is well settled that a plaintiff may present alternative theories of liability based on the same set of facts.  *See* Fed. R. Civ. P. 8(a)(3); *see also Centra, Inc. v. Chandler Ins. Co., Ltd.*, 229 F.3d 1162, 2000 WL

1277672, *16 (10th Cir. Sept. 7, 2000) (unpublished table decision).  Thus, a desire for

housekeeping notwithstanding, Plaintiff can present both the harassment and

discrimination claims, even though they are based on essentially the same conduct.

Therefore, the Court denies summary judgment on Plaintiff's third claim, as well.

## IV.    FOURTH, FIFTH, AND SIXTH CLAIMS – § 1983 AND BREACH OF CONTRACT

Plaintiff alleges that Defendant violated 42 U.S.C. § 1983 by allowing a hostile

work environment (claim four) and discriminating against her on the basis of gender

(claim five).  Her sixth claim sounds in state law breach of contract.  Defendant argues

that Plaintiff's § 1983 claims and breach of contract claim cannot survive Eleventh

Amendment immunity.  Plaintiff responds that Defendant is not a state agency and,

therefore, the Eleventh Amendment does not apply.  Alternatively, Plaintiff responds

that, if Eleventh Amendment immunity does apply to these three claims, Plaintiff is

entitled to prospective relief under the *Ex Parte Young* exception.

A.    <u>Applicable Law – Eleventh Amendment Immunity</u>

The Eleventh Amendment states:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

The Eleventh Amendment accords states the sovereign right of immunity from

suit, including suits initiated by the state's own citizens.  *See Edelman v. Jordan*, 415

U.S. 651, 662-63 (1974).  Eleventh Amendment immunity does not preclude a federal

court from exercising jurisdiction over a matter.  *See Wisconsin Dep't of Corrs. v.*

*Schacht*, 524 U.S. 381, 389 (1998).  Instead, the Eleventh Amendment provides states

with the legal authority to assert the defense of sovereign immunity.  *Id.*  A state may

waive its sovereign immunity, but the decision to waive immunity is voluntary and will

not be found readily.  *College Sav. Bank v. Florida Prepaid Postsecondary Educ.*

*Expense Bd.*, 527 U.S. 666, 675 (1999).  Typically, to waive sovereign immunity, a state

must voluntarily invoke the jurisdiction of the federal courts, *e.g.*, remove a case from

state court, or make a "clear declaration" that it intends to submit itself to federal

jurisdiction.  *Id.* at 675-76; *see also Lapides v. Board of Regents*, 535 U.S. 613, 624

(2002) (removal to federal court voluntarily invokes federal jurisdiction and waives

Eleventh Amendment immunity).

     The Eleventh Amendment extends to states and state entities, but not to

counties, municipalities, or other local political subdivisions.  *See Mount Health City*

*Sch. Dist. v. Doyle*, 429 U.S. 274, 280 (1977).  To qualify for Eleventh Amendment

immunity, an entity must be an "arm of the state."  *Id.*  To determine whether a particular

entity meets this definition, courts should examine the "nature of the entity created by

state law."  *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 & n.5 (1997).  In

other words, under state law, is the entity "more like a county or city than it is like an

arm of the State[?]"  *Doyle*, 429 U.S. at 280.

The Tenth Circuit Court of Appeals has identified four factors help courts determine whether an entity constitutes an arm of the state for Eleventh Amendment purposes:

(1)    What does state law say about the character of the entity in question?

(2)    How much autonomy is accorded to the entity under state law?

(3)    What amount of funding does the entity receive from the state versus its own ability to issue bonds or levy taxes?

(4)    Is the entity concerned primarily with local or state affairs?

*See Steadfast Ins. Co. v. Agricultural Ins. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007) (citing *Sturdevant v. Paulsen*, 218 F.3d 1160, 1162, 1164, 1166 & 1168-69 (10th Cir. 2000)).

B.    <u>Eleventh Amendment Immunity Bars Plaintiff's § 1983 And Breach Of Contract Claims</u>.

Defendant relies heavily on *Rozek v. Topolnicki*, 865 F.2d 1154, 1158 (10th Cir. 1989), a case involving claims under § 1983 and a Colorado district attorneys office. In that case, the plaintiff contended that the district court should not have granted sovereign immunity to the defendant, the Office of the District Attorney for the Eighteenth Judicial District because the defendant was not a state agency. *Id.* The Tenth Circuit Court of Appeals disagreed, and cited to Colorado case law for the proposition that in Colorado, a district attorney is an executive officer of the state. *Id.* This lead the appellate court to hold that, "The district court did not err in concluding that

the Office of the District Attorney . . . [is] entitled to Eleventh Amendment immunity in this case." *Id.*

Rozek spawned at least one additional case that Defendant cites to enforce its argument that Defendant in this case is a state agency entitled to sovereign immunity. *See Musick v. Pickering*, 2005 WL 2739028, *2 (D. Colo. Oct. 24, 2005) ("As an initial matter, it is abundantly clear that the District Attorney's Office and Pickering in his official capacity enjoy Eleventh Amendment immunity from plaintiff's federal claims."); *see also Romero v. Boulder County DA's Office*, 2004 WL 100523, *1 (10th Cir. Jan. 22, 2004) ("Moreover, the action is barred by the Eleventh Amendment as it pertains to . . . the Boulder County District Attorney's Office.  The district attorney is a state officer under Colorado law.") (internal citations omitted).

Plaintiff attempts to skirt *Rozek* and its progeny by citing to *Steadfast*, making a brief argument under the four-factor test, and pointing to a letter from the Colorado Attorney General stating in part, "[Y]ou are advised that this office does not represent the District Attorney's Office for the Thirteenth Judicial District as it is neither a state agency nor a state employee."

    1.    *Treatment In State Law*

Multiple state court decisions on this issue have concluded that a district attorney is a state executive officer.  *See Beacom v. Board of County Comm'rs*, 657 P.2d 440, 445 (Colo. 1983) (examining various foundational statutes and holding that a district attorney "is an executive officer of the state")*; Tisdel v. Board of County Comm'rs*, 621

P.2d 1357, 1361 (Colo. 1980) ("The district attorney is a state public officer."); *People ex rel. VanMeveren v. District Court for Larimer County*, 527 P.2d 50, 52 (Colo. 1974) ("A district attorney belongs to the executive branch."); *Anderson v. Adams County*, 592 P.2d 3, 4 (Colo. Ct. App. 1978) ("The district attorney is a state officer serving a particular judicial district, independent of the county government, with authority to hire and fire his own employees.") (citing C.R.S. § 20-1-209 (1973).  Perhaps the Colorado Court of Appeals phrased it most convincingly when it recently held, "The district attorney is a state officer and a member of the executive branch of state government." *Free Speech Defense Comm. v. Thomas*, 80 P.3d 935, 937 (Colo. Ct. App. 2003).

However, in the most recent state decision the Court has been able to locate on the subject, the Colorado Supreme Court muddied the waters somewhat by holding that judicial districts, *i.e.*, the organization units served by a district attorney, are "political subdivisions of the state."  *Davidson v. Sandstrom*, 83 P.3d 648, 656 (Colo. 2004).

*Davidson* pointed out that judicial districts represent finite geographical areas within the state and district attorneys are empowered to appear on behalf of not only the state, but also the several counties that comprise their respective districts.  *Id.*  Most critical to the *Davidson* court was the fact that district attorneys answer primarily to the voters in their district.  *Id.*  Thus, at first glance, *Davidson* might support the proposition that Defendant is not an arm of the state but, rather, is a political subdivision more akin to a city or county.

However, a first glance at *Davidson* does not end the discussion.  Justice Hobbs wrote a concurring opinion in *Davidson*, in which Justice Coats joined, that expressed a somewhat different view regarding the nature of judicial districts.  *Id.* at 661.  The concurrence noted that:

> In contrast to political subdivisions, judicial districts have no local governing body to which their officers–judges and district attorneys--are responsible; judicial district funds that pay salaries are predominately state funds appropriated by the General Assembly; and judicial districts may not incur debt.  They exist by reason of Article VI, section 10 [of the Colorado Constitution] to deliver the services of the third branch of government-the administration of justice-to the citizens of Colorado.  As part of this basic design, judges hear criminal cases; district attorneys serve an executive function within the judicial branch by bringing those cases to the courts.

*Id.* at 662.  Thus, Justices Hobbs and Coats concluded that, "Judicial districts are not within" the definition of a political subdivision.  *Id.*

The Court concludes that, *Davidson* notwithstanding, the weight of state case law, including Justice Hobbs' concurrence, directs a finding of Eleventh Amendment immunity in this case.  *Davidson* is only one case among many Colorado state court decisions to find that a district attorney is anything but an arm of the state, and the concurrence undercuts the majority's decision in especially relevant ways.  For example, the majority points out that district attorneys answer to the population of voters in a finite geographic area, but Justice Hobbs points out that district attorneys also must answer to the state general assembly.  *Id.*; *see also People v. Losavio*, 606 P.2d 856, 858 (Colo. 1980) (noting that district attorney is a state officer who may be impeached by general assembly).  Likewise, the *Davidson* majority noted that Colorado law

requires district attorneys to appear on behalf of the counties within their judicial district,

but Justice Hobbs noted that the statutes also require a district attorney to appear on

behalf of the state as a whole.  *See* C.R.S. § 20-1-102(1) ("Every district attorney shall

appear in behalf of the state and the several counties of his district."); C.R.S. § 20-1-

102(3) ("The district attorney, when enforcing laws pursuant to statute or contract, may

use any remedy, either civil or criminal, available under the laws of this state and may

appear on behalf of the people of the state of Colorado in any judicial district in this

state.  When doing so, the district attorney represents the people of the state of

Colorado . . . .").  Additionally, district attorney salaries are set by state statute, C.R.S. §

20-1-301, not county or local ordinance, and, critically, are paid primarily out of state

coffers.  *See* C.R.S. § 20-1-306 ("The salaries of district attorneys . . . shall be paid in

twelve equal monthly installments of which the state shall contribute eighty percent

annually and the counties making up each district the balance . . . .").  Even the majority

in *Davidson* concedes that a district attorney is not a county employee and that a district

attorney's business intertwines state responsibilities with county responsi-bilities.

*Davidson*, 83 P.3d at 660.[18]

Moreover, the majority opinion in *Davidson* did not express any desire to overrule

the substantial body of state law holding that district attorneys are state officers; it

merely interpreted a statutory phrase, "political subdivision of the State of Colorado," to

---

[18]   Although the majority does correctly point out that the various counties of a judicial district set a district attorney's annual budget, including employee salaries.  *See id.*; C.R.S. §§ 20-1-302, 306.

include judicial districts.  The *Davidson* majority buttressed its conclusion by discussing

the role of the district attorneys office, but it did not actually hold that a district attorneys

office, like Defendant in this case, was a political subdivision of the state.  Therefore,

*Davidson* did not express an opinion directly relevant to the Eleventh Amendment

immunity analysis in this case, but instead merely added a lone, potentially contrasting

voice to the choir of state law decisions on the topic.[19]  This Court cannot join *Davidson*

in singing against the choir and finds that a survey of state law reflects that Defendant is

a state agency subject to Eleventh Amendment immunity.

> 2.  *State Control Over Defendant*

Obviously, district attorneys have wide discretion in deciding whom to prosecute

and how to conduct their prosecutions.  *See, e.g., Gansz v. People*, 888 P.2d 256, 258

(Colo. 1995) (discussing prosecutorial discretion); *People v. Kurz*, 847 P.2d 194, 196

(Colo. Ct. App. 1992) ("The decision to prosecute is within the exclusive province of the

district attorney.").  District attorneys also have the prerogative to appoint deputy district

attorneys and assistant district attorneys with the approval of the board or boards of

county commissioners for the judicial district in which the district attorney serves.

*See* C.R.S. §§ 20-1-201, 205.

---

[19]  Of course, the same should be said for all of the state cases – not one of them
directly addresses whether a district attorneys office is an arm of the state for purposes of
Eleventh Amendment immunity.  This is not surprising since Eleventh Amendment immunity
is a question of federal law and these are state court decisions.  However, given that none of
the state cases address Eleventh Amendment immunity, *Davidson* is no more influential in the
analysis than any of the previous state decisions, and, may be less influential, given the strong
concurrence by Justice Hobbs.

However, prosecutorial discretion extends only to the district attorney himself, not necessarily to the office of the district attorney.  In fact, the state statutes proscribe the autonomy of a district attorney's office in several respects.  For example, the authority to appoint deputies and assistants is heavily tempered and controlled by statute.  *See* C.R.S. §§ 20-1-201, 205 (describing the roles of deputy and assistant district attorneys). Furthermore, the district attorney has several non-delegable duties mandated by statute, *see* C.R.S. § 20-1-102(1)(a)-(e), which may not be supplanted by another office or agency.  *See Losavio*, 606 P.2d at 62.  Moreover, as Justice Hobbs points out in *Davidson*, judicial districts, and, by extension, district attorneys offices, may not incur debt like a city or county can.  *See* 83 P.3d at 662.

Thus, although a district attorney like Mr. Watson may have discretion in deciding whom to prosecute, the office of a district attorney, like Defendant in this case is relatively trammeled by the state general assemply in various important respects. As such, this factor also reflects that Defendant is a state agency for purposes of Eleventh Amendment immunity.

   3. *Defendant's Finances*

The state provides eighty percent of a district attorney's salary, suggesting that a district attorneys office is an arm of the state.  *See* C.R.S. § 20-1-306.  However, the county or counties that make up a judicial district provide funding for the rest of a district attorneys office's operations, including the salaries of deputies and assistants, staff people, and other operating costs.  *See* C.R.S. §§ 20-1-103, 302.  This might provoke

one to think that Defendant is a political subdivision, rather than a state agency.

However, the critical issue under this factor is whether Defendant has the ability to issue

bonds or levy taxes to support itself; and it clearly does not.  Defendant's inability to

incur debt indicates that Defendant is more like an arm of the state than a political

subdivision.  Thus, the financial factor suggests that Defendant is entitled Eleventh

Amendment immunity.

### 4.    *Focus On Local And/Or State Affairs*

Many of the Defendant's functions and purposes are described above.  The

Court need not explain that enforcement of state-wide criminal laws spans well beyond

the interests of the local judicial district.  Moreover, a district attorneys office, like

Defendant, may represent the people of the State of Colorado in state courts outside

of its own judicial district.  However, many of Defendant's responsibilities bear a

substantial relationship to the judicial district that Defendant serves, even if the matters

may generally involve state-wide issues.  *See* C.R.S. § 20-1-102 (listing various duties

to be performed by district attorney on behalf of his judicial district).  Thus, this factor

provides support for neither party's position.

In sum, the four factor analysis proves that Defendant is more like an arm of the

state than a political subdivision.  Most critical in this conclusion is the heavy body of

state case law holding that district attorneys are state officers, not county or city officers,

and the fact that district attorneys offices cannot incur debt or levy taxes.  The dual

nature of Defendant's focus – local and state affairs – is not sufficient to controvert the previous three factors which sway in favor of Eleventh Amendment immunity.

Further, this Court has serious reluctance to contravene otherwise valid authority from the Tenth Circuit Court of Appeals and sister judges in this district.  Therefore, the Court concludes that Defendant is a state agency with the power to assert the defense of sovereign immunity under the Eleventh Amendment.

5. *Prospective Relief*

Given that the Court has concluded the Eleventh Amendment applies in this case, Plaintiff contends that she is entitled to rely on the exception to Eleventh Amendment immunity announced by the Supreme Court in *Ex Parte Young*, 209 U.S. 123 (1908).  However, Defendant correctly points out that Plaintiff cannot fit her claims into the narrow exception created by *Ex Parte Young*.

Critically, the *Ex Parte Young* exception only applies in cases when a plaintiff seeks only declaratory and/or injunctive relief and has alleged an ongoing violation of federal law by state officials acting in their official capacities.  *See Tarrant Reg'l Water Dist. v. Sevenoaks*, 545 F.3d 906, 911 (10th Cir. 2008); *Hill v. Kemp*, 478 F.3d 1236, 1255-56 (10th Cir. 2007).

In this case, Plaintiff has not sued any state officials acting their official capacities.  Rather, she has sued only the Office of the District Attorney for the 13th

Judicial District, a state agency.  This fact alone, which Plaintiff does not and cannot dispute, precludes application of the *Ex Parte Young* exception.[20]

As such, summary judgment against Plaintiff's § 1983 and breach of contract claims is appropriate.

## CONCLUSION

This case involves a lengthy and in-depth factual history.  Although Plaintiff's pleadings and briefing have not been a model of clarity, they do manage to impart the picture of a potentially hostile and retaliatory workplace.  Defendant's attempts to isolate certain instances of harassing and retaliatory conduct, and remove them from the totality of the circumstances in an effort to obtain summary judgment on Plaintiff's Title VII claims prove largely unpersuasive.  When viewed in a light favorable to Plaintiff, she has provided simply too many instances of potentially unlawful conduct by Defendant's employees to dispose of Plaintiff's Title VII claims on summary judgment.

However, the Court finds that Defendant is entitled to summary judgment on the largely duplicative § 1983 and state law breach of contract claims because of Eleventh Amendment Immunity.

Accordingly, Defendant's Motion for Summary Judgment (Doc. # 55) is GRANTED IN PART AND DENIED IN PART.

---

[20]   Defendant also argues that Plaintiff has not requested anything that could properly be categorized as prospective relief, *e.g.,* an injunction.  However, the Court need not address this argument since it is clear that Plaintiff has not plead claims against any state officials in their official capacities.

IT IS ORDERED that Summary Judgment is DENIED with respect to Plaintiff's First, Second, and Third Claims; and

IT IS FURTHERED ORDERED that Summary Judgment is GRANTED with respect to Plaintiff's Fourth, Fifth, and Sixth Claims, and those claims are DISMISSED WITH PREJUDICE.

DATED:  July  16 , 2009

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge